# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY PGIARK03780-02, as subrogee of ROESLEIN ALTERNATIVE ENERGY, LLC,<br><br>Plaintiffs,<br>v.<br><br>THE CINCINNATI INDEMNITY COMPANY, and INDUSTRIAL & ENVIRONMENTAL CONCEPTS, INC.,<br><br>Defendants. | Case No. |

## COMPLAINT

Plaintiffs Certain Underwriters at Lloyd's, London Subscribing to Policy PCIARK03780-02 ("Underwriters") as subrogee of Roeslein Alternative Energy, LLC ("Roeslein") file this lawsuit against The Cincinnati Indemnity Company ("Cincinnati") and Industrial & Environmental Concepts, Inc. ("IEC") for each's breach of contract and duties owed to Roeslein. Specifically, IEC failed to add Roeslein as an additional insured on its commercial general liability policy procured through Cincinnati, as required by a Design/Build Agreement between Roeslein and IEC; and, Cincinnati failed to defend and indemnify Roeslein, and breached its fiduciary duty to Roeslein, with respect to a lawsuit brought against it by Kyle Carrington in the Circuit Court of Gentry County, Missouri, captioned *Carrington v. Roeslein Alternative Energy of Missouri, LLC, et al.,* Case No. 21GE-CC00096. In further support of its claims against Defendants, Underwriters states:

1

## PARTIES

1. Plaintiffs Underwriters are insurers based in London, England. Underwriters subscribed to Policy No. PCIARK03780-02 ("Policy") issued to Roeslein Alternative Energy, LLC, with an inception date of June 1, 2016, and an expiration date of June 1, 2017.

2. Roeslein is a Missouri limited liability company with its principal place of business in Missouri. Roeslein is an operator and developer of renewable energy production facilities that convert agricultural and industrial waste, along with renewable biomass feedstock, into renewable natural gas and other sustainable products. Roeslein has assigned its claim against Cincinnati to Underwriters as required under the Policy.

3. Cincinnati is an Ohio corporation licensed to do business in Missouri but with its principal place of business at 6200 S. Gilmore Road, Fairfield, Ohio 45014-5141. Cincinnati may be served through the Director of Insurance.

4. Industrial & Environmental Concepts, Inc. is a New Mexico corporation headquartered in Minnesota at 21390 Heywood Avenue, Lakeville, Minnesota 55044. It may be served through its registered agent at CT Corporation System, 206 South Coronado Avenue, Espanola, NM 87532.

## JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 in that this dispute is between citizens of different States and citizens of a foreign state.

6. Underwriters are composed of four syndicates, as follows:

    a. Ark Corporate Member Limited ("Ark. Corp.") and Scor Underwriting Limited ("Scor") are the members of Syndicate 4020. Ark. Corp. is a private limited company incorporated in England and Wales, and also has its principal place of

2

business in London, England (30 Fenchurch Avenue, London EC3M 5AD, United Kingdom). Ark. Corp. is a wholly-owned subsidiary of Group Ark Insurance Holdings Limited, which is a wholly-owned subsidiary of Ark Insurance Holdings, Limited. White Mountains Insurance Group, Ltd., which is publicly traded on the New York Stock Exchange as WTM, holds a majority interest in Ark Insurance Holdings, Ltd.. Scor is incorporated in England and Wales and has its principal place of business in London, England at 10 Lime Street, London, EC3M 7AA, United Kingdom.

b. Syndicate 1458 managed by RenaissanceRe Syndicate Management Ltd. ("RenRe"), which has one subscribing member, RenaissanceRe Corporate Capital (UK) ("RenRe Capital"), which is incorporated in the United Kingdom with its principal place of business in London, England;

c. Syndicate 1084 managed by Chaucer Syndicate Ltd. ("Chaucer"), with one member, Chaucer Corporate Capital (No. 3) Ltd., which is incorporated in the United Kingdom with its principal place of business in London, England; and

d. MSA Corporate Member Ltd. is the sole underwriting member of Syndicate 2001. MSA Corporate Member Ltd. is a limited company registered in England and Wales with a registered office in London, England (The Leadenhall Building, 122 Leadenhall Street, London EC3V 4QT, United Kingdom). Pursuant to a contract of reinsurance, Syndicate 3500, managed by RiverStone Managing Agency Limited, has reinsured the relevant liability of the underwriting member of Syndicate 2001, which includes obtaining the benefit of the rights of subrogation. RiverStone Corporate Capital Limited is the sole

3

underwriting member of Syndicate 3500. RiverStone Corporate Capital Limited is a private limited company incorporated in England and registered at UK Companies House, with a registered office address of Park Gate, 161-163 Preston Road, Brighton, East Sussex, United Kingdom, BN1 6AU.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because Roeslein is a resident of St. Louis, Missouri, and was injured at its principal place of business in St. Louis when Cincinnati and IEC breached their respective obligations to Roeslein.

## FACTS COMMON TO ALL COUNTS

### The Underlying Lawsuit

8. Kyle Carrington filed case number 21GE-CC00096 in the Circuit Court of Gentry County, Missouri on August 5, 2021 seeking damages for bodily injury from AE Resources Group, a Roeslein Alternative Energy Company as a defendant instead of Roeslein, as well as IEC, and Chris Cureton. On January 28, 2021, Carrington filed his second amended petition wherein he renamed Defendant AE Resources Group to correctly identify it as Roeslein Alternative Energy, LLC. A copy of the Second Amended Petition ("Petition") in the Lawsuit is attached as Exhibit 1.

9. Carrington's Petition alleged that he and Cureton were employees of IEC. Carrington's primary job for IEC was to operate a forklift. At all relevant times, Cureton was Carrington's supervisor. *See* Exhibit 1, ¶¶ 6-7, 20.

10. Carrington's Petition alleged that on September 26, 2016, Carrington and Cureton were working for IEC on excrement ponds at a farm owned by Roeslein. *See* Exhibit 1, ¶ 13.

11. Carrington's Petition alleged that his work included covering excrement ponds,

4

which was done by placing large rolls of plastic material across a pond and then welding them together in a process called leistering. *See* Exhibit 1, ¶¶ 8-10.

12. Carrington's Petition alleged that excrement ponds produce methane gas. *See* Exhibit 1, ¶¶ 10-11.

13. Carrington's Petition alleged that leistering was only to be performed after methane gas was extracted from the ponds; that he was trained by IEC never to use welding equipment in the presence of methane gas due to the possibility of ignition and/or explosion. *See* Exhibit 1, ¶ 10.

14. Carrington's Petition alleged that on September 26, 2016, he and other IEC employees excavated a trench around a particular excrement pond and laid plastic over that pond. *See* Exhibit 1, ¶¶ 14, 17.

15. Carrington's Petition alleged that a Roeslein employee placed a methane extraction pipe into the pond, but did not extract the methane gas. *See* Exhibit 1, ¶ 19.

16. Carrington's Petition alleged that he spoke with Cureton about whether Roeslein had extracted the methane gas before any welding occurred; that he and Cureton discussed that the presence of methane gas was dangerous and could result in a fire or explosion. *See* Exhibit 1, ¶¶ 20-23.

17. Carrington's Petition alleged that despite expressing his safety concerns to Cureton, Cureton instructed him to weld the plastic cover around the methane extraction pipe, regardless of whether methane gas was still present. *See* Exhibit 1, ¶ 24.

18. Carrington's Petition alleged that in his role as IEC's project supervisor, Cureton told Carrington that he could lose his job or his pending promotion if he did not weld the pond cover, despite the risks of welding in the presence of methane gas. *See* Exhibit 1, ¶¶

5

25-26.  Carrington further alleged that Cureton did not permit Carrington any opportunity to determine if the methane had been extracted before welding the cover.  *See* Exhibit 1, ¶ 30.

19. Carrington's Petition alleged that when he began welding the cover, a spark ignited the methane gas and the welder blew up in his hands.  *See* Exhibit 1, ¶ 31.

20. Carrington's Petition alleged that he sustained injuries from the explosion.  *See* Exhibit 1, ¶ 39, 46.

21. Carrington's Petition alleged separate counts of negligence against Roeslein (Count I) and IEC (Count II) for each's independent acts of negligence.  *See generally*, Exhibit 1.  Carrington's allegations against IEC included that he was injured as a result of IEC's failure to provide a reasonably safe workplace, and that IEC willfully and knowingly disregarded a known danger and required him to use a welding torch in the presence of methane gas.  *See* Exhibit 1, Count II.

22. IEC filed a Motion to Dismiss the claims against it based on Missouri's general rule that Worker's Compensation provides the exclusive remedy for employees hurt on the job.  On May 5, 2022, the Circuit Court of Gentry County dismissed IEC as a defendant from the Lawsuit, holding it was immune from suit for its negligence based on Missouri's Workers' Compensation law.  The Circuit Court did not dismiss the claims against Cureton or Roeslein, though Carrington later dismissed Cureton.

23. On September 8, 2022, the Circuit Court of Gentry County held a hearing on Carrington's Motion for Judgment on the Pleadings, after which the Court entered judgment in favor of Carrington and against Roeslein for $500,000 for his injuries sustained in the accident (the "Judgment").  A copy of the judgment is attached as Exhibit 2.

24. The Judgment contained "findings and conclusions" including:

6

(6)     On September 26, 2016, Carrington was working for IEC on a farm jobsite in Bethany, Missouri, owned by Roeslein. Carrington was working to cover excrement ponds on that site. As part of that task, Carrington and other IEC workers dug a trench around a specific excrement pond. Roeslein was handling the methane extraction for ponds on this project. In order for Roeslein to extract the methane gas from this pond, the IEC workers removed a portion of the plastic covering to place the extraction pipe.

(7)     Carrington believed that Roeslein had not extracted the methane gas from this particular pond and discussed his concern with his supervisor, Cureton, before welding the extraction pipe in place. Carrington specifically told Cureton that the presence of methane gas was dangerous so that welding could cause a fire or explosion. He also expressed that he was concerned for his own safety if forced to weld the plastic cover around the extraction pipe unless the methane gas had been extracted.

(8)     Cureton instructed Carrington to weld the cover around the pipe even if methane gas was present. Cureton specifically told Carrington that he would lose his job and/or a pending promotion that he believed he was in line to receive unless he performed the welding job when instructed to do so. Cureton expressed his clear understanding of the potential risk of fire or explosion but disregarded the danger. Cureton did not allow Carrington to wait to determine if the methane gas had been extracted before beginning to weld.

(9)     Roeslein had not extracted the methane gas from that particular excrement pond before the welding was ordered by IEC.

(10)    When Carrington began the process or welding, a spark ignited, and the welder blew up in his hands. The explosion threw him back against the trench wall as flames went up his arms and into his face. In a desperate effort to extinguish the flames, when he was extracted from the trench, Carrington dropped into a nearby puddle that contained both mud and excrement.

(11)    Carrington suffered internal and external burns to his hands, arms, face, throat, lungs, and head as well as PTSD and emotional trauma as a result of the incident.

(12)    Carrington incurred medical bills, for which the amount of $65,114.96 was paid.  In addition, he has incurred significant lost wages as he has been unable to return to work since 2017 due to physical and emotional issues sustained in the incident.  Carrington is unlikely to ever

7

return to meaningful employment.

(13) Defendant Roeslein was negligent in failing to fully extract the methane gas from the excrement pond and failing to prevent Carrington or other IEC employees from working on or near the subject pond. IEC and its employee, Cureton, were negligent when he ordered Carrington to proceed with welding the extraction pipe knowing that the methane gas may not have been removed, under threat of losing his job or promotion, and without allowing him to wait to determine if the methane gas had been properly removed. While Roeslein's negligence contributed to Carrington's injuries, without Cureton's/IEC's negligent actions, Carrington would not have been injured merely because Roeslein had not yet removed the methane gas.

*See* Exhibit 2.

25. The Judgment found Roeslein was negligent for failing to fully extract the methane gas from the excrement pond, and for failing to prevent Carrington from working on or near that pond. *See* Exhibit 2, ¶ 13.

26. The Judgment held that IEC and Cureton were negligent for ordering Carrington to proceed with welding despite knowing that the methane gas may not have been removed. *See* Exhibit 2, ¶ 13.

27. The Judgment found that Carrington would not have sustained any injury without IEC's and Cureton's negligent actions. *See* Exhibit 2, ¶ 13.

28. The Court entered Judgment for Carrington and against Roeslein in the sum of $500,000 for his injuries caused by the combined negligence of Roeslein, IEC, and Cureton. *See* Exhibit 2, ¶¶ 13, 14.

29. The judgment finding IEC/Cureton negligent, and awarding $500,000 to Carrington, is final.

**IEC's Contract with Roeslein**

30. On or about March 13, 2015, IEC and Roeslein entered into a contract titled

8

"Design/Build Agreement Between Owner and Design/Builder on a Lump Sum Basis" (the "Design/Build Agreement").  A true and accurate copy of relevant portions of the IEC Contract are attached as Exhibit 3.

31. The Design/Build Agreement designates Roeslein as "Owner" and IEC as "Design/Builder".  *See generally*, Exhibit 3.

32. The Design/Build Agreement defines the "Project", in pertinent part, as the "complete, fully integrated, fully functional and operational lagoon cover and gas collection system" with specified capacities and associated facilities described in specified exhibits on lands described in another exhibit and included "all associated structures and other Work to be constructed by Design/Builder in accordance with the Agreement."  *See* Exhibit 3, Section 1.1.13.

33. The Design/Build Agreement defines "Site", in pertinent part, as the farm owned by Roeslein upon which IEC was performing work on September 26, 2016 pursuant to the Design/Build Agreement.  *See* Exhibit 3, Section 1.1.15.

34. Section 5.2 of the Design/Build Agreement requires IEC to purchase and maintain certain insurance.  It states:

> 5.2 **Design/Builder's Liability Insurance.**
>
> 5.2.1  Design/Builder shall purchase and maintain such Commercial General Liability (subject to customary exclusions in respect of professional liability), Automobile Liability and Worker's Compensation insurance as is appropriate for the Work being performed and furnished and as shall provide protection from claims set forth below which may arise out of or result from Design/Builder's performance and furnishing of the Work and Design/Builder's other obligations under the Agreement, whether it is to be performed or furnished by Design/Builder, any Engineer, Subcontractor or Supplier employed by Design/Builder, or by anyone directly or indirectly employed by any of them to perform or furnish any of the Work, or by anyone for whose

9

>   acts any of them may be liable;
>
>   [ . . . ]
>
>   5.2.1.2 Claims for damages because of bodily injury, occupational sickness or disease, or death of Design/Builder's employees;

*See* Exhibit 3.

35. The Design/Build Agreement required IEC to procure liability insurance to meet certain specific criteria. It states, in pertinent part:

>   5.2.2.1 With respect to insurance required by Sections 5.2.1.3through 5.2.1.6 inclusive, include as additional insureds, the Owner, Owner's affiliates and the property owner and any other persons or entities identified in writing by Owner, all of whom shall be listed as additional insureds, and include coverage for the respective Owner's officers and employees of all such additional insureds;
>
>   5.2.2.2 Include at least the specific coverage's and be written for not less than the limits of liability set forth in Exhibit J (Insurance Limits and Certificate of Insurance) or required by Laws or Regulations, whichever is greater; 5.2.2.3 Include contractual liability insurance covering Design/Builder's indemnity obligations under the Agreement;

*See* Exhibit 3.

### IEC's CGL Policy through Cincinnati Indemnity Company

36. Cincinnati issued a CGL Policy to IEC with Policy Number EPP0050444/EBA0050444 (the "Cincinnati Policy"). A true and correct copy of the Cincinnati Policy is attached hereto as Exhibit 4.

37. The Cincinnati Policy was in full force and effect on September 26, 2016.

38. The Cincinnati Policy included Commercial General Liability Coverage with an Each Occurrence Limit of $1,000,000 and a General Aggregate Limit of $2,000,000.

39. The Cincinnati Policy includes certain endorsements applicable to the Commercial General Liability Coverage, including GA233, titled "Contractors' Commercial

General Liability Broadened Endorsement." *See,* Exhibit 4, Commercial General Liability Coverage Part Declarations.

    40.    Endorsement GA233 includes the following language:

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CONTRACTORS' COMMERCIAL GENERAL LIABILITY BROADENED ENDORSEMENT**

This endorsement modifies insurance provided under the following:
**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

[ . . . ]

**C.  Coverages:**

[ . . . ]

  **9. Automatic Additional Insured - Specified Relationships**

    **a.** The following is hereby added to **SECTION II - WHO IS AN INSURED**:

      **(1)** Any person or organization described in Paragraph **9.a.(2)** below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under this Coverage Part by reason of:

      **(a)** A written contract or agreement; or

      [ . . . ]

      is an insured, provided:

      **(a)** The written or oral contract or agreement is:

        **1)** Currently in effect or becomes effective during the policy period; and

        **2)** Executed prior to an "occurrence" or offense to which this insurance would apply; and

    **(b)** They are not specifically named as an additional insured under any other provision of, or endorsement added to, this Coverage Part.

  **(2)** Only the following persons or organizations are additional insureds under this endorsement, and insurance coverage provided to such additional insureds is limited as provided herein:

[ . . . ]

    **(f)** Any person or organization with which you have agreed per Paragraph **9.a.(1)** above to provide insurance, but only with respect to liability arising out of "your work" performed for that additional insured by you or on your behalf. A person or organization's status as an insured under this provision of this endorsement continues for only the period of time required by the written contract or agreement, but in no event beyond the expiration date of this Coverage Part. If there is no written contract or agreement, or if no period of time is required by the written contract or agreement, a person or organization's status as an insured under this endorsement ends when your operations for that insured are completed.

[ . . . ]

41. Roeslein is an Automatic Additional Insured on the Cincinnati Policy pursuant to the terms of endorsement GA233.

42. Roeslein repeatedly requested that Cincinnati defend and indemnify it for the claims being asserted against it by Carrington in the Lawsuit.

43. Despite Roeslein being an Automatic Additional Insured under the clear terms of the Cincinnati Policy, Cincinnati refused to defend it against Carrington's claims in the Lawsuit.

44. Despite Roeslein being an Automatic Additional Insured under the clear terms of the Cincinnati Policy, and despite multiple opportunities to do so, Cincinnati refused to

indemnify Roeslein or settle the claims against it.

### Settlement of Carrington's Claims Against Roeslein

45. After Cincinnati's repeated refusals to defend or indemnify it, Roeslein reached a settlement with Carrington (the "Settlement Agreement"). Under the terms of the settlement, Roeslein and Carrington agreed to have a hearing in the Lawsuit at which Carrington would present evidence of his claim, including his injuries and claimed damages. A true and correct copy of Settlement Agreement between Roeslein and Carrington is attached hereto as Exhibit 5.

46. The Settlement Agreement did not specify any agreed amount for the Court to enter as Carrington's damages in any judgment. However, regardless of how much the Court might award to Carrington for his damages, the Settlement Agreement provided that Roeslein would pay Carrington the sum of $500,000 in exchange for a full satisfaction of judgment. *See* Exhibit 5.

47. Roeslein provided a copy of the Settlement Agreement to Cincinnati on or about May 10, 2022.

48. Cincinnati did not attempt to intervene in Carrington's Lawsuit at any point after receiving a copy of the Settlement Agreement.

49. The hearing was held on September 8, 2022, at which the Court heard evidence and entered its Judgment in the Lawsuit for Carrington and against Roeslein in the amount of $500,000. *See* Exhibit 2.

50. Roeslein caused the sum of $500,000 to be paid to Carrington to satisfy the Judgment, and Carrington has filed a satisfaction of judgment. *See* the Court's docket in case number 21GE-CC00096.

## COUNT I – BREACH OF CONTRACT
## AGAINST THE CINCINNATI INDEMNITY COMPANY
## FAILURE TO DEFEND

51. Roeslein incorporates the allegations of paragraphs 1-50 as if fully stated herein, *in haec verba*.

52. Roeslein was an Automatic Additional Insured pursuant to the terms of the Cincinnati Policy, such that there was an enforceable contract between Roeslein and Cincinnati.

53. Cincinnati was contractually obligated by the Cincinnati Policy to defend Roeslein against Carrington's claims set forth in the Lawsuit.

54. Cincinnati failed to defend Roeslein against Carrington's claims set forth in the Lawsuit.

55. Cincinnati's failure to defend Roeslein in the Lawsuit was a breach of the insurance contract that provided coverage to Roeslein for the claims of Carrington in the Lawsuit.

56. As a result of Cincinnati's failure to defend Roeslein against Carrington's claims in the Lawsuit, Roeslein was caused to incur costs and expenses in defending itself against Carrington's claims, and thereby suffered damages.

Wherefore, Plaintiff Underwriters, as subrogee of Roeslein, pray this Court award them damages in an amount to fully and fairly compensate them for Cincinnati's failure to defend Roeslein, for their costs and expenses incurred herein, for interest allowed by law, and for such other and further relief as the Court deems just and proper in the premises.

## COUNT II – BREACH OF CONTRACT
## AGAINST THE CINCINNATI INDEMNITY COMPANY
## FAILURE TO INDEMNIFY

57. Roeslein incorporates the allegations of paragraphs 1-56 as if fully stated herein, *in haec verba*.

58. Roeslein was an Automatic Additional Insured pursuant to the terms of the Cincinnati Policy, such that there was an enforceable contract between Roeslein and Cincinnati.

59. Cincinnati was contractually obligated by the Cincinnati Policy to indemnify Roeslein against Carrington's claims set forth in the Lawsuit.

60. Cincinnati failed to indemnify Roeslein against Carrington's claims set forth in the Lawsuit.

61. Cincinnati's failure to indemnify Roeslein was a breach of the insurance contract that provided coverage to Roeslein for the claims of Carrington in the Lawsuit.

62. As a result of Cincinnati's failure to indemnify Roeslein against Carrington's claims in the Lawsuit, Roeslein was caused to incur costs and expenses in defending itself against Carrington's claims and settling Carrington's claims against it, and thereby suffered damages.

Wherefore, Plaintiff Underwriters, as subrogee of Roeslein, pray this Court award them damages in an amount to fully and fairly compensate them for Cincinnati's failure to indemnify Roeslein, for their costs and expenses incurred herein, for interest allowed by law, and for such other and further relief as the Court deems just and proper in the premises.

## COUNT III – BREACH OF FIDUCIARY DUTY
## AGAINST THE CINCINNATI INDEMNITY COMPANY

63. Roeslein incorporates the allegations of paragraphs 1-62 as if fully stated herein, *in haec verba*.

64. Roeslein was an Automatic Additional Insured pursuant to the terms of the Cincinnati Policy, such that there was an enforceable contract between Roeslein and Cincinnati.

65. Because Roeslein was an insured under the Cincinnati Policy, Cincinnati owed it certain fiduciary duties to act on its behalf in both defending and settling the claims against it by Carrington in the Lawsuit.

66. Cincinnati failed to defend and indemnify Roeslein against Carrington's claims in the Lawsuit.

67. Cincinnati breached its fiduciary duty to Roeslein.

68. As a result of Cincinnati's breach of its fiduciary duty to Roeslein, Roeslein was caused to incur costs and expenses in defending itself against Carrington's claims and settling Carrington's claims against it, and thereby suffered damages.

Wherefore, Plaintiff Underwriters, as subrogee of Roeslein, pray this Court award them damages in an amount to fully and fairly compensate them for Cincinnati's breach of its fiduciary duty to Roeslein, for their costs and expenses incurred herein, for interest allowed by law, and for such other and further relief as the Court deems just and proper in the premises.

## COUNT IV – BREACH OF CONTRACT
## AGAINST INDUSTRIAL & ENVIRONMENTAL CONCEPTS, INC.

69. Roeslein incorporates the allegations of paragraphs 1-68 as if fully stated herein, *in haec verba*.

16

70. At all times relevant, the Design/Build Agreement was an enforceable contract between Roeslein and IEC.

71. The Design/Build Agreement required IEC to include Roeslein as an additional insured on its commercial general liability policy procured through Cincinnati.

72. IEC failed to include or add Roeslein as an additional insured on its commercial general liability policy procured through Cincinnati.

73. In failing to include or add Roeslein as an additional insured on its Cincinnati Policy, IEC breached its duties to Roeslein set forth in the Design/Build Agreement.

74. As a result of IEC's breach of the Design/Build Agreement, Roeslein was caused to incur costs and expenses in defending itself against Carrington's claims and settling Carrington's claims against it, and thereby suffered damages.

Wherefore, Plaintiff Underwriters, as subrogee of Roeslein, pray this Court award them damages in an amount to fully and fairly compensate them for IEC's breach of the contract, for their costs and expenses incurred herein, for interest allowed by law, and for such other and further relief as the Court deems just and proper in the premises.

Date: April 5, 2024                           Respectfully submitted,

*/s/ M. Courtney Koger*
M. Courtney Koger    MO #42343
KUTAK ROCK LLP
2300 Main Street, Suite 800
Kansas City, MO 64108
Tel: 816-960-0900
Fax: 816-960-0041
Courtney.Koger@KutakRock.com

17